1

1

2                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
3                        EASTERN DIVISION

4    UNITED STATES OF AMERICA,

5           Plaintiff,              Case No. 1:13CR70
                                    Cleveland, Ohio
6        vs.                        Thursday, January 17, 2013
                                    3:20 p.m.
7    WILLIAM T. KOCH,

8           Defendant.

9

10    TRANSCRIPT OF PRELIMINARY EXAMINATION AND DETENTION HEARING
          BEFORE THE HONORABLE WILLIAM H. BAUGHMAN, JR.
11                  UNITED STATES MAGISTRATE JUDGE

12

     APPEARANCES:
13

     For the Government:  Michael A. Sullivan
14                        Office of the U.S. Attorney - Cleveland
                          Carl B. Stokes U.S. Courthouse
15                        801 Superior Avenue, West, Suite 400
                          Cleveland, Ohio 44113
16                        (216) 622-3600

17    For the Defendant:  Edward G. Bryan
                          Office of the Federal Public Defender
18                        Skylight Office Tower, Suite 750
                          1660 West Second Street
19                        Cleveland, Ohio 44113
                          (216) 522-4856
20
     Court Reporter:      Caroline Mahnke, RMR, CRR
21                        Federal Building & U.S. Courthouse
                          2 South Main Street, Suite 568
22                        Akron, Ohio 44308
                          (330) 252-6021
23

24

25    Proceedings recorded by ECRO; transcript produced by
     computer-aided transcription.

1          JANUARY 17, 2013, 1:39 A.M.

2          THE DEPUTY CLERK:  This Honorable Court is now in

3    session pursuant to recess.  The Honorable William H.

4    Baughman, Junior, United States Magistrate Judge presiding.

5          Please be seated.

6          Please make sure that all cell phones and other

7    electronic devices are turned off.  The taking of photos,

8    the making of audio/video recordings, and broadcasting of

9    any kind is prohibited.  If this court order is not obeyed,

10   you will forfeit your device and subject yourself to further

11   sanctions.

12          THE COURT:  Ms. Hach, call the case.

13          THE DEPUTY CLERK:  Your Honor, the case before

14   the Court this afternoon is United States of America versus

15   William T. Koch, bearing Case Number 1:13MJ9010.

16          THE COURT:  Counsel for the United States, are

17   you ready to proceed?

18          MR. SULLIVAN:  Yes, Judge.  On behalf of the

19   United States of America, Michael A. Sullivan.

20          THE COURT:  And counsel for Mr. Koch, are you

21   ready to proceed?

22          MR. BRYAN:  Edward Bryan on behalf of Mr. Koch.

23   Yes, Your Honor.

24          THE COURT:  We're here today for a detention

25   hearing and a preliminary hearing in this matter.

1          Mr. Sullivan, you may proceed.

2               MR. SULLIVAN:  Thank you.

3          The United States calls Kelly Liberti.

4               THE COURT:  Ms. Liberti, please come forward and

5     be sworn.

6                         KELLY LIBERTI,

7          of lawful age, a witness called by the Government,

8            being first duly placed under oath, was examined

9                    and testified as follows:

10               DIRECT EXAMINATION OF KELLY LIBERTI

11    BY MR. SULLIVAN:

12    Q.    Good afternoon.  Would you please state your name and

13    spell your last name for the record?

14    A.    Kelly Liberti, L-I-B-E-R-T-I.

15    Q.    And by whom are you employed?

16    A.    By the FBI.

17    Q.    In what capacity?

18    A.    As a special agent.

19    Q.    And how long have you been so employed?

20    A.    Seventeen years.

21    Q.    Where are you currently assigned?

22    A.    To the Elyria resident agency.

23    Q.    Okay.  And in that capacity, are you familiar with the

24    facts and circumstances regarding the investigation of

25    William T. Koch?

1    A.    Yes, I am.

2    Q.    All right.  And in furtherance of that investigation,

3    did you prepare an affidavit in support of the criminal

4    complaint that brings us here today?

5    A.    I did.

6    Q.    And have you had a chance to review that affidavit?

7    A.    I have.

8    Q.    And as you sit here today, do you reaffirm what's

9    contained in that affidavit?

10   A.    I do.

11   Q.    Previously, specifically September 20 of 2012, did you

12   present an affidavit in support of an application for a

13   search warrant in this case?

14   A.    I did.

15   Q.    And did you prepare that affidavit?

16   A.    Yes, I did.

17   Q.    Have you had an opportunity to review that affidavit?

18   A.    I have.

19   Q.    I'm going to show you what's been marked as

20   Government's Exhibit 1 for identification and ask you if you

21   recognize that?

22   A.    I do.

23   Q.    And is that the affidavit we just spoke of?

24   A.    It is.

25   Q.    And as you sit here today, do you again reaffirm all

1    the facts -- or do you reaffirm all the facts as contained

2    in that affidavit?

3    A.    Yes.

4    Q.    All right.  Can you detail for us the chronology of

5    this investigation?

6    A.    In August of 2011 I received information from our

7    office in San Francisco that a young actor, age 13, had

8    received a text message asking him for naked pictures of

9    himself or, the sender of the text said, "If you don't send

10   a naked picture, I will make your life a living hell."

11        In investigating that text message, we determined that

12   it had been sent by a user at 26178 Osborne Road in Columbia

13   Station, Ohio.

14        Agent Lisa Hack and I went to that address.  We

15   interviewed William J. Koch and William T. Koch about these

16   text messages.

17        And during those interviews, William T. Koch did admit

18   that he had sent those.  He was aware of the victim's age

19   and told us he would not do it anymore.

20   Q.    Now, when you say it was a young actor, an actor in

21   what?

22   A.    The actor was one of the boys who played Billy in the

23   Broadway musical Billy Elliot.  And that production tours

24   across the United States.

25        So at the time the text message was received, he was

1    performing in San Francisco.

2    Q.    So on that date on August 18 when you -- of 2011 when

3    you spoke to Mr. William T. Koch, did you have a

4    conversation with him about Billy Elliot as well?

5    A.    Yes.  He told us that Billy Elliot was his life, that

6    he loved the musical.  He made trips to go see it to various

7    cities and was on the chat rooms, the forums online, you

8    know, chatting.

9    Q.    Okay.  And while you were actually there interviewing

10   him, did you become aware of another separate investigation

11   that had occurred at that same house?

12   A.    We did.  We became aware through the statements that

13   were made by both of the Kochs that the Lorain County

14   Sheriff's Department had also executed a search warrant

15   previously and had seized computers and electronic devices

16   from the home.

17   Q.    And do you know what the nature of that investigation

18   was for?

19   A.    Yes.  In July of 2010, the Lorain County sheriff's

20   office had received an ICAC report that someone at 26178

21   Osborne Road, Columbia Station, Ohio, had been downloading

22   and sharing pornography.

23         They executed a search warrant in December of 2010 and

24   seized three computers from the home.

25   Q.    Okay.  And have you been -- subsequently, are you

1    aware of the results of any forensic examination of those

2    computers?

3    A.    Yes, I am.

4    Q.    And can you just briefly tell us about that.

5    A.    The Lorain County sheriff's office seized a Dell

6    tower, a MacBook, and a Toshiba laptop.

7          The Toshiba laptop had belonged to William T. Koch up

8    until about a month before the search warrant was executed

9    by Lorain County.

10         He had then purchased a MacBook which he had been

11    using for approximately one month prior to the search.

12         Forensic exams to date have shown child pornography

13    has been found on all threes of these devices.

14    Q.    You mentioned the MacBook and the Toshiba laptop.

15    What was the third one?

16    A.    The Dell tower.

17    Q.    Oh, I see, okay.

18          And in addition, on the Toshiba laptop was there

19    anything else on there that would be relevant for your

20    investigation?

21    A.    On the Toshiba laptop, they found Google searches for

22    the following searches:  Cracking Facebook passwords,

23    stealing Facebook user names and passwords, beginner

24    hacking, Facebook hacking, how to hack any Facebook, how to

25    steal identities, how to use the SpyAgent program, how to

1    find the last digits of a social security number, how does a

2    preteen know if he is gay, and how do you know if a preteen

3    is gay.

4    Q.    Okay.

5    A.    They also found multiple visits to Facebook pages for

6    actors starring in the Billy Elliot production?

7    Q.    Okay.  All right.  And while you were at that -- while

8    you were at the house on August 18, 2011, did you have any

9    conversation with William T. Koch about the child

10   pornography investigation?

11   A.    We did.  At that time he told us that it was his

12   father who had downloaded the child pornography and his

13   father had threatened him if he told anyone.

14   Q.    Okay.  But again, the results of the investigation

15   disclosed the presence of child pornography on all three

16   computers, including the two that were used by William T.

17   Koch?

18   A.    Yes.

19   Q.    So just if you can maybe just provide us just a

20   timeline of activities, what else did your investigation

21   reveal?

22   A.    Our investigation showed that as early as December,

23   2010, child actors in the Billy Elliot production were

24   receiving -- all receiving very similar text messages.

25         Beginning in December 2010, on the 19th, Victim 1, who

1      at that time was age 13, had received messages that his

2      Facebook account was hacked.  The very next day, Victim 1

3      received a text message to send naked pictures in exchange

4      for the Facebook account back.

5            In June of 2011, Victim Number 2, the victim from San

6      Francisco, received text messages asking for naked pictures

7      or his life would become a living hell.

8            In February, 2012, Victim Number 1's Skype and Yahoo

9      accounts were hacked.

10           February 25 and 26, Victim Number 3, a 15-year-old,

11     received a Facebook message.

12     Q.    I'm going to stop you one second.

13     A.    Sure.

14     Q.    Couple things.  One, first of all, you're kind of

15     giving us an overview.  In the affidavit which we have

16     marked as Government's Exhibit 1, is there more detail about

17     these communications between the defendant and these

18     different actors?

19     A.    Yes.  In the affidavit the text messages are described

20     in full.

21     Q.    Okay.  And now, Victim Number I think 3, is this the

22     one victim that we're talking about, the only victim that we

23     know of that is not a Billy Elliot actor?

24     A.    That is correct.

25     Q.    Okay.  And tell us about Victim Number -- and then

1    just to be clear, Victim Number 3 is the victim related to

2    the charge in the criminal complaint we're standing here

3    for?

4    A.    Yes, it is.

5    Q.    All right.  Go ahead.

6    A.    Victim Number 3 received a Facebook message from

7    someone named Ariella Gold wanting to chat on Facebook.

8    Q.    And this is back in February of 2012?

9    A.    That was back in February of 2012.  It went

10   unanswered.

11         Received the same type of message in March of 2012.

12   That also was not answered.

13         On March 14, 2012, Victim Number 4, a Billy Elliot

14   actor, age 11, received text messages asking him to get on

15   Skype.  And his younger brother also received text messages

16   asking him to get on Skype when his parents were not around.

17         In May 2012 -- and both of those were unanswered.

18   Q.    Okay.

19   A.    In May, 2012, a local actor in the Cleveland area who

20   was 11 years old received a text message from William T.

21   Koch saying, "Hey, I want to tell you that I smoke pot, I'm

22   gay, and I've done bad things."  That also went unanswered.

23   Q.    Now, just with that one, you said he is a local actor.

24   Where does he act?

25   A.    This was a local actor who was part of a group here

1   called the Olmsted Performing Arts Group.

2   Q.    And did your investigation reveal whether or not Mr.

3   William T. Koch had any relationship with that group?

4   A.    Yes.  Mr. Koch had joined that group and was with them

5   for a short time.  And he, after this text message was

6   received, he was asked to leave the group.

7   Q.    I'm sorry.  How old was that?

8   A.    11 years old.

9   Q.    All right.  So that was May of 2012.  If we can move

10  forward.

11  A.    In August, August 10, 2012, Victim Number 3 received

12  another Facebook message from Ariella Gold which was not

13  answered.

14        On August 24, Victim Number 4 received Skype messages

15  from someone pretending to be another Billy Elliot actor

16  asking for Victim Number 1's phone number and threatened to

17  make Victim Number 4's life a living hell if he did not

18  provide the phone number.

19  Q.    Okay.  I just want to be -- and on that, so you have

20  one Billy Elliot actor receiving a Skype message from

21  someone pretending to be another Billy Elliot actor asking

22  him for the phone number of yet a third Billy Elliot actor?

23  A.    That's correct.

24  Q.    Okay.  Go ahead.

25  A.    On August 31, 2012, Victim Number 1 received text

1    messages from an unknown person saying they needed to talk

2    to him.

3        On August 31, 2012, Victim Number 5, age 14, received

4    a series of text messages from someone calling themselves

5    Kelsey, asking sexually oriented questions, and then a

6    message that said, "Send me a pic, fucker, or I will tell

7    all your friends you are gay."

8        On September 4, 2012, Victim Number 6, age 13,

9    received a text message to "send a nude or your life will be

10   a living hell."

11       On September 5, 2012, Victim Number 6 was sent another

12   message to send a nude.

13       Victim Number 5 received text messages on September 8

14   and September 9, 2012 requesting nude photographs.

15       Also on September 9, 2012, Victim Number 3 received a

16   Facebook message from Ariella Gold offering to strip for

17   him.  He did respond to that message, and he then Skyped

18   with the person he believed to be Ariella Gold.  The person

19   he believed to be Ariella Gold sent him naked photographs of

20   a teen girl.

21       In exchange, Ariella Gold asked him to masturbate on

22   camera, which he did masturbate on camera, and he followed

23   Ariella Gold's directions.

24       After that, Ariella Gold asked the victim to show his

25   face on camera.  When he refused, Gold sent a message saying

1   that she was actually a 45-year-old man and that his

2   accounts were fake, and he told our victim, "You have to

3   have sex with your ten-year-old brother on camera or I will

4   distribute all these pictures of you masturbating to your

5   family and friends," because he had obtained the family and

6   friends contact list through Facebook.

7   Q.     Okay.

8   A.     On September 13, 2012, Victim Number 5 received

9   messages from someone pretending to be a Billy Elliot actor

10  asking for Victim Number 1's phone number.  The person then

11  admitted that they weren't that bill Elliot actor but a

12  14-year-old girl.  They then said, "If I don't get a nude

13  from you tonight, I will tell all your friends you fucked me

14  and make your life a living hell."

15        On September 13, 2012, Victim Number 6 received a

16  message saying, "If I don't get a nude picture, I will tell

17  all your friends you are gay and you fucked my brother."

18        On September 18, 2012, Victim Number 5 received text

19  messages threatening to hack his Facebook account and tell

20  everyone he is gay.  He was also asked for a nude picture.

21  And then he received, the victim, received a picture of a

22  penis with a threat that the sender would tell everyone that

23  it belonged to Victim Number 5.

24        On September 24, a federal search warrant was executed

25  at the Koch residence.  We seized electronics and all items

1   which could connect to the Internet along with more than 100

2   DVD's and disks of recordings of Broadway productions which

3   we learned were being sold online.

4   Q.   Now, you participated in that search; is that correct?

5   A.   Excuse me?

6   Q.   You participated in that search?

7   A.   Yes, I did.

8   Q.   And had you submitted all that digital equipment for

9   forensic evaluation?

10   A.   Yes, I have.

11   Q.   Have you received any results back yet?

12   A.   Not yet.

13   Q.   All right.  So when you went there on September 24,

14   was Mr. William T. Koch at home?

15   A.   Yes, he was.

16   Q.   Was anybody else at home?

17   A.   His mother and his younger brother.

18   Q.   Did you have a conversation with any of them?

19   A.   I had a very brief conversation with Mr. Koch.

20   Q.   And what was that, the nature of that conversation?

21   A.   He asked what the search warrant was about.  I

22   informed him that it was about text messages that were sent

23   to various actors of Billy Elliot.  I talked a little bit

24   about the first victim.

25        After hearing about that, he said, "I don't want to

1    hear anymore.  I want to talk to a lawyer."

2    Q.    And did you have a conversation with his mother as

3    well?

4    A.    I did not, but Agent Lisa Hack did.

5    Q.    All right.  And did she make her aware of the nature

6    of what was going on?

7    A.    Yes, she did.

8    Q.    And can you tell us -- and did she have any

9    conversation with William T. Koch's mother about William T.

10   Koch and his -- about him?

11   A.    Yes, she did.

12   Q.    Can you tell us what was said?

13   A.    Sure.  She told us that William T. Koch graduated from

14   high school in approximately 2007 or 2008.  He was a very

15   good student with good grades.

16        He attended Cleveland State University as part of the

17   accounting program.  He lived on campus for the first year.

18   When his grades started to slip, he moved back home.  Once

19   he lived back at home, his grades were A's and B's.

20        His mother said he does not have a driver's license.

21   And despite having cerebral palsy, he is a good student who

22   definitely knows right from wrong and has good behavior.  No

23   mental impairment at all.

24        She also told us, though, that sometimes he would tell

25   her that he needed to go Downtown Cleveland to take exams at

1    Cleveland State University.  She would drive him downtown

2    for that purpose.  And then hours later he would telephone

3    her and say he left and was out of town, usually to see a

4    Broadway Show.

5    Q.    So he would leave the state?

6    A.    Leave the state.

7    Q.    On his own?

8    A.    Yes.

9    Q.    All right.  Now -- and did she also -- did she

10   indicate at that time something about a problem with him,

11   maybe a previous iPhone and some spending habits?

12   A.    Yes.  She had taken his -- she told Agent Hack that

13   she had taken his iPhone from him about three months before

14   the search warrant because she had discovered he had been

15   making purchases without her knowledge, that he had

16   accumulated approximately $70,000 in credit card debt that

17   was rung up in his father's name.

18   Q.    Okay.  Now, I just want to go back briefly.  When you

19   spoke of all those text messages that these different Billy

20   Elliot actors had and some of the communication with this

21   young boy in Canada, did the two affidavits, both of which

22   we have discussed, the one that's marked as Government's

23   Exhibit 1 and the other one which accompanies the criminal

24   complaint, do they have details in there about investigation

25   that has traced the IP addresses?

1   A.   Yes, they do.

2   Q.   And does all that information, does it generally show

3   that all these communications have come from the same home

4   we've been talking about?

5   A.   Yes.  They all came from the IP address that is

6   registered to the Kochs.

7   Q.   All right.  So the federal search warrant was on

8   September 24 of 2012.  And you made it clear to the Kochs

9   why you were there and taking all their equipment?

10  A.   Yes, we did.

11  Q.   All right.  And do you know, did the Internet activity

12  occur subsequent to that?

13  A.   Yes.  We found out that in November, on or about

14  November 12, 2012, Victim Number 3's younger brother, who is

15  ten years old, received a Facebook friend request from

16  Ariella Gold.

17  Q.   So that's the ten-year-old boy that Ariella Gold was

18  asking Victim Number 3 to have sex with?

19  A.   Yes.

20  Q.   Okay.  So then he received a direct Facebook friend

21  request?

22  A.   Yes.

23  Q.   Okay.  And do you know if some records from Facebook

24  had been subpoenaed?

25  A.   Yes, they have.

1   Q.   And does it show login times and such?

2   A.   Yes.

3   Q.   All right.  And does it show whether or not Ariella

4   Gold was logged in on that date that you spoke of?

5   A.   Yes.  Ariella Gold was logged in on November 12.

6   Q.   And does it show when the last time Ariella Gold was

7   logged in?

8   A.   I believe it was November 28, 2012.

9   Q.   All right.  So did you recently swear out a criminal

10  complaint and get an arrest warrant?

11  A.   Yes, I did.

12  Q.   Did you also get an additional search warrant?

13  A.   Yes, I did.

14  Q.   And did you execute those?

15  A.   We did.

16  Q.   When was that?

17  A.   We executed the warrant last Friday which was January

18  11, 2013.

19  Q.   All right.  And can you tell us if you found any

20  digital equipment at the Koch residence?

21  A.   We found that all the electronics appeared to be

22  replaced.  We seized three Motorola Droid Smartphones from

23  William T. Koch's mother, father, and brother.

24       We found an unsecured laptop computer that was used by

25  the whole family.  It was on the floor in between the

1   kitchen and the dining room.  It was not password protected.

2   Mr. and Mrs. Koch told us they did not know how to password

3   protect it.

4           We found -- the home was equipped with a wireless

5   router and a modem, an Xbox Live console which connects to

6   the Internet that was in Sean Koch's bedroom, the younger

7   brother, which he told us his brother did use.

8           We found a broken Toshiba laptop, a Play Station 2,

9   and more disks labeled to contain productions of Broadway

10  shows.

11  Q.    All right.  And then lastly, do you know, is

12  there -- as far as -- we've been talking about William T.

13  Koch.  And the father is who?

14  A.    William J. Koch.

15  Q.    All right.  And are you familiar whether or not

16  William J. Koch has any criminal history?

17  A.    Yes.  Mr. Koch was recently released from jail on a

18  one-year sentence for gross sexual imposition.

19  Q.    And do you know any of the details of that case?

20  A.    I spoke with Sergeant Stephen Klopfenstein from the

21  Brunswick Hills Police Department.  He told us that his

22  police department had an investigation concerning Mr. Koch,

23  William T. Koch, and Mr. Koch's brother who is Mr. Reichle,

24  and Mr. Reichle's son which would be Mr. Koch's nephew.  And

25  the case concerned rape charges against Mr. Reichle's -- or

1    concerning Mr. Reichle's daughters.

2    Q.    And were they minors at the time of the --

3    A.    Yes.

4    Q.    All right.  And as a result of that investigation, do

5    you know, did Mr. William J. Koch, what he was ultimately

6    charged with?

7    A.    He was ultimately charged with gross sexual

8    imposition.

9    Q.    Do you know what he was arrested for originally?

10   A.    He was arrested for rape.

11   Q.    And then he plead out to gross sexual imposition?

12   A.    That's correct.

13   Q.    And then he severed a year?

14   A.    Approximately.

15   Q.    Okay.  And is he a registered sex offender?

16   A.    Yes.

17   Q.    All right.

18          MR. SULLIVAN:  I have nothing further.

19          THE COURT:  Mr. Bryan.

20          MR. BRYAN:  Yes, thank you.

21            CROSS-EXAMINATION OF KELLY LIBERTI

22   BY MR. BRYAN:

23   Q.    Good afternoon, Special Agent.

24   A.    Hello.

25   Q.    Special Agent Liberti, this investigation literally

1    seems to be, based upon your affidavit, your search warrant

2    affidavit and the affidavit attached to your criminal

3    complaint, seems to have been taking place over a period of

4    years involving multiple law enforcement agencies, correct?

5    A.    Yes.

6    Q.    In fact, the first law enforcement agency that seemed

7    to have investigated the Koch residence was the Lorain

8    County Sheriff's Department?

9    A.    Correct.

10   Q.    And that was involving a child pornography

11   investigation that was taking place at that time?

12   A.    Yes.

13   Q.    And do you remember the date that that investigation

14   began?

15   A.    July 23, 2010.

16   Q.    Okay.  So July 23, 2010 there was an investigation.

17   Did they have sort of a task force there in Lorain County

18   that was investigating?  It says ICAC, the Ohio Internet

19   Crimes Against Children Task Force?

20   A.    Yes.

21   Q.    And so an investigator, David Frattare or Frattare,

22   (pronouncing) was the investigator who -- well, I guess, was

23   he with Lorain County sheriff's?  Or was he with BCI or

24   someone like that?

25   A.    He was on the task force.

1   Q.    Okay.  Do you know what agency he's employed by?

2   A.    No, I do not.

3   Q.    Okay.  You just know he's a member of the task force?

4   A.    Correct.

5   Q.    And using peer-to-peer software, he logged

6   onto -- this IP address in paragraph 21 of your -- do you

7   have your affidavit in front of you?

8   A.    I have part of it.

9   Q.    The search warrant affidavit.

10  A.    Um-hum.

11  Q.    The IP address that's listed is 173.88.214.63,

12  correct?

13  A.    Correct.

14  Q.    And is that the IP address that's associated with the

15  Koch residence?

16  A.    Yes.

17  Q.    Okay.  And that IP -- a computer associated with that

18  IP address was using LimeWire to allow the browsing of a

19  shared folder, correct?

20  A.    The subpoena result showed that on the date and time

21  the files were downloaded, that at that day and time the IP

22  address was assigned to the account registered to William

23  Koch.

24  Q.    Okay.  Now, I'm not -- I'm certainly not anywhere near

25  a computer expert, and I know you probably aren't either.

1    But your training has probably required you to learn a

2    little bit more about IP addresses than me.

3          Can you explain in essence what an IP address is?

4    A.    An IP address is like your -- your computer's home

5    address.  Just like your house has an address, you live at

6    123 Main Street, your computer also has an address.

7          Now, your computer's address, though, as an IP

8    address, may not stay the same throughout time.  That's why

9    when we request IP address information, we make it very

10   specific to a date and time of a certain download so that we

11   know where that address was assigned on that date at that

12   time.

13   Q.    Can you explain to me why it may not stay the same

14   throughout time?

15   A.    No, I can't.  I'm not an expert in reassigning IP

16   address numbers.

17   Q.    So IP address numbers can be reassigned to different

18   computers?

19   A.    I don't know about reassigned.  I know they do change

20   over time.

21   Q.    They can change over time?  And the reason I ask that

22   question -- and we will go forward in your affidavit --

23   there are parts in your affidavit where information wasn't

24   available for certain IP addresses, correct?

25   A.    Correct.

1    Q.    And we will go through that here in a minute.

2          But basically the investigation began with the Koch

3    residence in Lorain County with the Lorain County sheriff's

4    office, correct?

5    A.    Correct.

6    Q.    And that was back in 2010?

7    A.    Correct.

8    Q.    Okay.  When was the first time that you became aware

9    of the Kochs and the Koch residence?

10   A.    When I received a lead in August of 2011 from San

11   Francisco.

12   Q.    Okay.  And that concerned messages being sent to one

13   of the Billy Elliot actors out in San Francisco?

14   A.    Correct.

15   Q.    And that individual had received text messages from a

16   certain telephone number, correct?

17   A.    Yes.

18   Q.    Would that be paragraph 25 of your affidavit?

19   A.    Yes.

20   Q.    Okay.  And in those text messages, there is obviously

21   some inappropriate communication that's taking place?

22   A.    Correct.

23   Q.    And there is a request for a nude photo, and saying

24   that if they didn't provide the nude photo, that they would

25   make their life a living hell or something like that?

1    A.    Yes.

2    Q.    Okay.  Obviously that individual never sent the nude

3    photo, correct?

4    A.    Correct.

5    Q.    And do you know if that person received any further

6    text messages after they refused to send a nude photo?

7    A.    I don't believe anymore were received.

8    Q.    Okay.  So there was the one threat, but there wasn't a

9    follow-up or anything like that?

10   A.    Yes.

11   Q.    Okay.  And at the time the individual was in San

12   Francisco?

13   A.    Yes.

14   Q.    Okay.  And again, I guess there is discussions in

15   paragraph 26 about "Textfree is a free application by Pinger

16   that runs on an Apple iOS and Android devices. . ."  Is that

17   an Apple iPhone?  ". . . and Android devices and uses the

18   carrier's data connection or Wi-Fi connection to send text

19   messages to mobile phones"; correct?

20   A.    Um-hum, yes.

21   Q.    And you had an administrative subpoena served on

22   Pinger, I guess, the service provider for that?

23   A.    Yes.

24   Q.    And it says that the telephone number revealed an

25   Apple user I.D. that came back to William J. Koch, Osborne

1   Road, Columbia Station, correct?

2   A.    Correct.

3   Q.    Now, do you know from Pinger whether or not the

4   information regarding the address that that number came back

5   to could have been provided -- or how it was provided?

6   A.    Pinger didn't provide the address.  Pinger provided

7   the Apple user I.D.

8   Q.    Okay.

9   A.    And the Apple user I.D. came back to Mr. -- basically

10  tells you that that device is registered to this person.

11  Q.    Okay.  And the Apple -- so the Apple user I.D. isn't

12  contained in paragraph 27, correct?

13  A.    Correct.

14  Q.    So it just says Apple user I.D.

15        Now, are you aware, with the training that you

16  received concerning computer crimes, how unique the

17  user -- I know that there is only one user I.D. for each

18  device, but whether or not those devices' user I.D.'s can be

19  masked or used in any other way?

20  A.    I would probably have to work at Apple to know that,

21  yeah, I don't -- I'm not familiar with that.

22  Q.    I mean, you testified somewhat about people hacking

23  other people's FaceBook accounts and hacking their other

24  Internet accounts and things like that?

25  A.    Well, I interviewed the statements that were made

1    about that and searches that were found.

2    Q.    Right.

3    A.    Not about the actual process.

4    Q.    Okay.  But do you know from your training and

5    experience in this area that people do have the ability to

6    hack other people's accounts and use their information?

7    A.    No, I do not.

8    Q.    To mask their own activities?

9    A.    No, I do not.

10   Q.    Are you saying you don't know --

11   A.    For an Apple I.D. number?

12   Q.    Correct.

13   A.    I do not.

14   Q.    So you're saying you don't know if that's possible or

15   that's not possible?  You don't know from your own

16   experience?

17   A.    I do not know if it is possible to hack someone's

18   Apple I.D.  When you register your device, you have an

19   Apple -- your device has a user I.D. number.

20   Q.    Okay.  Or if that user I.D. could be masked by

21   somebody else and used?

22   A.    I don't know that.

23   Q.    Okay.  Because of this information, though, you did go

24   and interview William Koch, my client, William T. Koch,

25   correct?

1   A.    Correct.

2   Q.    His father is William J.  And he indicated that, to

3   you at that time he made admissions that he in fact was the

4   person who sent that text message to the actor in San

5   Francisco, correct?

6   A.    Yes, he did.

7   Q.    Okay.  When you first met with Mr. Koch, do you

8   remember what you told him?  Or what did you say to him when

9   you first met with him?

10  A.    That we were conducting an investigation into a text

11  message received by a Billy Elliot actor and that our

12  investigation had shown that the text message was sent from

13  someone in that house.

14  Q.    Okay.  Did you indicate to him or did you -- that you

15  were prepared to seize all of his electronic devices in the

16  house at that time?

17  A.    No, I did not at that time.

18  Q.    And investigate the matter further if he wasn't

19  prepared to admit his involvement in that?

20  A.    No.  We asked him to look at his phone while we were

21  there, but not that -- we did not have a seizure warrant or

22  anything like that.

23  Q.    Okay.  Have you since -- did you seize that phone or

24  did you ever seize that phone?

25  A.    No.  We looked at it.

1   Q.    Okay.  Were you able to find the text message in the

2   memory of that phone?

3   A.    No.  That phone wasn't the device that was used.

4   Q.    Okay.  What was the device that was used?

5   A.    The device that was used to send that text message was

6   actually an iPod Touch --

7   Q.    Okay.

8   A.    -- that William T. Koch had recently given to his

9   brother Sean.

10  Q.    Okay.

11  A.    Because he had replaced it with an iPhone?

12  Q.    Okay.  Were you able to examine the iPod Touch to see

13  if that text message was in the history of that phone?

14  A.    The iPod Touch contained the application Textfree, but

15  we did not see the message.  Those are easily deleted.

16  Q.    Okay.  But it had an app to use that same Textfree

17  program --

18  A.    Correct.

19  Q.    -- that could be used to send texts, correct?

20  A.    Correct.

21  Q.    And that's a very common app that lots of devices use,

22  correct?

23  A.    I don't know how common it is.  I've never used it

24  myself.

25  Q.    Okay.  But there was no corresponding text messages

1    found in any device at the Koch residence that reflected the

2    message that was sent to the actor?

3    A.    Yeah, we did not seize the iPad so it was not

4    searched.

5    Q.    Okay.  But notwithstanding that, you had an admission

6    from Billy Koch that he is the one that sent the text

7    message anyway?

8    A.    Correct.

9    Q.    And you were satisfied with that admission that he was

10   the one who sent that text?

11   A.    Correct.

12   Q.    And he was never told at any time that he was going to

13   be placed under arrest if he didn't cooperate and may have

14   to come down to the FBI office or anything like that?

15   A.    No.

16   Q.    And be held in custody?

17   A.    No.  On that day, no.

18   Q.    Okay.  Now, you did notice on that day that Mr. Koch

19   appeared to have a disability, correct?

20   A.    Correct.

21   Q.    You learned that he suffers from cerebral palsy?

22   A.    Correct.

23   Q.    In any way did the fact that he suffers from cerebral

24   palsy play into your discretion not to place him under

25   arrest at that time?

1    A.    No.

2    Q.    Just the fact that you -- your discretion was based

3    upon the fact that maybe the text message attempted

4    something wrong but there was sort of like a no harm, no

5    foul situation?

6    A.    No, actually it wasn't -- it's not my discretion.  We

7    were following a lead from San Francisco, so we reported our

8    findings back to that office.

9    Q.    Okay.  So after that in 2011, you did learn that -- in

10   your affidavit there is a little bit of confusion because

11   the chronology sort of goes back in time.  I guess you did

12   additional investigation.

13         You said on May 14, 2012 you spoke to a woman named

14   Karon who is the mother of another Billy Elliot actor,

15   correct?

16   A.    Correct.

17   Q.    And learned that he had received some text messages

18   back on December 19, 2010, correct?

19   A.    Correct.

20   Q.    And it was from -- was it from the same telephone

21   number that the other actor -- or this is actually a

22   different telephone number, correct?

23   A.    It's a different number.

24   Q.    Right.  In paragraph 27, the telephone number is

25   424-248-8963, correct?

1   A.    Correct.

2   Q.    And so the telephone number for the December 19 call

3   was 406-420-8645, correct?

4   A.    Correct.

5   Q.    Now, this was something that had taken place two years

6   earlier?

7   A.    Correct.

8   Q.    Was this information that was saved by his mother?

9   A.    Yeah --

10  Q.    Or how did they know the dates and times?

11  A.    Because she had actually filed a report with the FBI's

12  Internet fraud complaint center.  So it was documented.

13  Q.    Okay.  So this was documented back in 2010, correct?

14  A.    Yes.

15  Q.    And this is sort of the same time period that the

16  Lorain County matter is coming to light?

17  A.    It was actually about approximately two weeks after

18  Lorain County had executed their search warrant.

19  Q.    Okay.  And when they executed their search warrant,

20  what devices did they seize, if you recall?

21  A.    They seized a Dell -- they seized a Dell tower, a

22  MacBook, and a Toshiba laptop.

23  Q.    Okay.  Do you know if the forensic examinations have

24  been done on those computers to reveal whether or not those

25  computers reflect activity that any one of those computers

1    were used to create these accounts, these fictitious

2    accounts, and also to hack the child actor's Facebook

3    account?

4    A.    I do not.  They are still conducting their forensic

5    exams to find child pornography.

6    Q.    Okay.  So there -- but has there been any attempt or

7    request to look in their -- again, I'm not sure where you

8    would look on the computer, but to see whether or not this

9    activity was perpetrated by any one of those --

10   A.    There is a request pending.

11   Q.    Okay.  But we don't have the results of that request?

12   A.    No.

13   Q.    Okay.  And so then you investigated the number that

14   was used in the December 19, 2010 incident, correct?

15   A.    Correct.

16   Q.    And it came back to Cable Vision Systems Corporation?

17   A.    Correct.

18   Q.    And where would they be located, if you recall?

19   A.    I believe they were out west.  I don't have an exact

20   address that I can remember offhand.

21   Q.    Okay.  An administrative subpoena served on Yahoo

22   showed an account -- and I have the blocked-out versus, but

23   a Yahoo.com account was created on Sunday, December 19, at

24   an IP address of 173.88.171.60, correct?

25   A.    Um-hum, yes.

1   Q.    Investigation in Cleveland showed at that date and
2   time that IP address belonged to Time Warner, RoadRunner
3   Hold Company for the same ISP previously shown used by Koch,
4   correct?
5   A.    Correct.
6   Q.    Now, this is the question I have for you:  "An
7   administrative subpoena served on RoadRunner met with
8   negative results as the date and time were beyond
9   RoadRunner's retention period."  What does that mean?
10  A.    RoadRunner only holds information for so long on IP
11  addresses because they do change.  So sometimes you will get
12  a letter back from them saying that the date and time you
13  requested are beyond our retention period.
14  Q.    Okay.  So when this paragraph says at the bottom of
15  paragraph 30, "Investigation in Cleveland showed at that
16  date and time that IP address belonged to Time Warner Cable,
17  RoadRunner, the same ISP. . ."  That's Internet service
18  provider, correct?
19  A.    Correct.
20  Q.    ". . . previously shown used by Koch," you're talking
21  about the general Internet service provider that is not only
22  used by the Kochs but is used by literally tens of thousands
23  of other people, correct?
24  A.    No.
25  Q.    The company?  The Internet service provider is the

1    company, correct?

2    A.    The Internet service provider is the company.

3    Q.    Who provides Internet service to tens of thousands of

4    customers, correct?

5    A.    Yes.

6    Q.    And it's the same company that provided the service to

7    the Kochs as well as tens of thousands of others?

8    A.    Correct.

9    Q.    But the IP address -- or excuse me, because of the

10   length, the passage of time or whatever, they weren't able

11   to isolate that specific IP address to the Koch residence,

12   correct?

13   A.    Too much time had gone by, yes.

14   Q.    Okay.  Do you have any evidence whatsoever that that

15   IP address was ever used by the Kochs or at the Koch

16   residence, the 173.88.171.60?

17   A.    I would have to look through the rest of the

18   affidavit.  There are several IP addresses in here.  Offhand

19   I can't answer that question.

20   Q.    But I mean, if that IP address had been associated

21   with the Kochs at any time, you surely would have reflected

22   that in the affidavit, correct?

23   A.    There are several IP addresses that are reflected in

24   the affidavit.  I would have to go through it paragraph by

25   paragraph, because there are several that came back to that

1   address.

2   Q.    Right.  Okay.  But at least in this paragraph of the

3   affidavit, you're not saying that that IP address came back

4   to the Koch residence, correct?

5   A.    Correct.

6   Q.    Just that it was the same Internet service provider as

7   the Kochs?

8   A.    Correct.

9   Q.    Okay.  So going then on to paragraph 31, on February

10  6, 2012 there is a question about the actor's Skype account,

11  and his Yahoo e-mail account were both hacked.  Again, the

12  show had just left Cincinnati, Ohio and was in Pittsburgh,

13  Pennsylvania, the next performance, when this occurred.

14        We're jumping from the 2010 incident now to the

15  February 26, 2012 incident, correct?

16  A.    Correct.

17  Q.    And so you used -- administrative subpoenas were

18  served on Yahoo, and the account was hacked.  It showed the

19  account was accessed by an IP address listed as

20  173.88.161.81, correct?

21  A.    Correct.

22  Q.    And this was the same Internet service provider that

23  the Kochs used, right?

24  A.    Correct.

25  Q.    As well as tens of thousands of other people, correct?

1    A.    Correct.

2    Q.    Do you know Time Warner Cable's reach, this RoadRunner

3    holding company?  Is this just an Ohio company, or is this

4    northeast United States or --

5    A.    No, I don't know that.

6    Q.    Okay.  But this subpoena served on RoadRunner for this

7    IP address, again says "met with negative results as the

8    date and time are beyond RoadRunner's retention period,"

9    correct?

10   A.    Correct.

11   Q.    So as it relates to that IP address, you don't have

12   specific evidence that this is registered to the Koch

13   address, correct?

14   A.    Correct.

15   Q.    Okay.  And so then the next paragraph, paragraph 32,

16   May 16, 2012, September 5, 2012, spoke with another mother

17   of one of the Billy Elliot actors.  He said that -- or she

18   said that on March 14 he received a series of text messages

19   when he was 11 years old.  You list the nature of the text

20   message.  There was a telephone number recovered.  Revealed

21   the number to be provided by Textfree.  Administrative

22   subpoena results received from Pinger for Textfree phone

23   said it came from an IP address that was 173.88.16.81 [as

24   spoken] which is the same IP address in paragraph 31,

25   correct?

1  A.   Correct.

2  Q.   And again, because of the passage of time, that IP

3  address couldn't be matched to the Koch residence or any

4  other residence at that time, correct?

5  A.   Correct.

6  Q.   Okay.  And then on August 24, 2012, there were text

7  messages to another Billy Elliot actor.  So it went on.

8       And again, similar threats were made about

9  leaving -- for them to do things, like give me so and so's

10  telephone number.

11      Do you know if those demands were ever met by any of

12  the actors?

13  A.   They were not.

14  Q.   Okay.  And nothing happened, right?  I mean, they

15  didn't continue to -- the texter didn't continue to text

16  after the demands were made?  They made one attempt?

17  A.   No, that's not correct.

18  Q.   Okay.  Paragraph 36, again we're back to Karen.  She's

19  the mother of the Billy Elliot actor that was in San

20  Francisco?

21  A.   No.

22  Q.   She was -- okay.

23      But on August 31, 2012, August -- her son received

24  another series of text messages.  The message was:  I will

25  need to talk to you.  Something very important.  Is this

1    blank's number?  And then there was a number, 301-852-6882

2    was the Textfree number.

3            Again, the same Internet service provider records were

4    sought.  IP address of 173.88.171.174.  Results, Time

5    Warner, and that one is subscribed to William Koch at

6    Osborne Road, correct?

7    A.    Correct.

8    Q.    And that's because it's a more recent Internet service

9    provider -- it's a more recent time request, correct?

10   A.    It is a more recent time request, so --

11   Q.    All right.

12   A.    I would be guessing to give that for a reason, but

13   that would be my assumption.

14   Q.    Is this the same Internet service provider -- excuse

15   me, the same IP address that was identified back in 2010?

16   A.    No.  It's different.

17   Q.    Okay.  So the devices do have a different -- have a

18   different address then, correct?  Like you said, the IP

19   address changes?

20   A.    I don't know about devices.  I know the IP address is

21   associated with your service.

22   Q.    Um-hum.  And this paragraph 38 talks about subpoena

23   requests from Apple for the Apple device that had a

24   registration number ending in 3D27, showed that it was

25   registered to W. T. Koch at Osborne Road in Columbia

1     Station, correct?

2     A.     Correct.

3     Q.     And then the application Textfree for iPad to get new

4     telephone numbers, twice on September 3, 2012, and September

5     12, 2012; correct?

6     A.     Correct.

7     Q.     And September 13, 2012?

8     A.     Correct.

9     Q.     And then these different e-mail addresses, do you have

10     that iPad?

11     A.     I do.

12     Q.     Okay.  And has forensics been done on that iPad to

13     show that computer activity?

14     A.     Not yet.

15     Q.     Okay.  You don't have that information yet?

16     A.     No, it's not available yet.

17     Q.     This Nine Mile Road, Auburn, Michigan, is that an

18     actual address that's listed in the bottom of paragraph 38?

19     A.     I don't know if that's an actual address.  It is not

20     the address of the person whose name was used to create an

21     account.

22     Q.     Okay.  Now, all of this information -- people continue

23     to receive text messages, and all of this information was

24     used in your affidavit for the search warrant that was

25     executed on September 24, correct?

41

1    A.    Correct.

2    Q.    And during the execution of that search warrant, you

3    seized not only the computers, but you seized the

4    Smartphones and other Internet accessible devices from the

5    home?

6    A.    With the exception, we did not seize the router or the

7    modem, but the devices that connected to it.

8    Q.    Okay.  And at that time you said in November -- I

9    think you said specifically November -- was it November 19?

10   No -- November 12 you subpoenaed records from Facebook and

11   determined that you've identified him as Victim 3.

12         Now, that was the individual who was in Canada,

13   correct?

14   A.    That's not the correct date.  And for clarity, the

15   subpoena was issued by ICE.

16   Q.    Okay.  But by ICE assisting the Canadian authorities

17   because the Canadian authorities opened an investigation

18   based upon the text messages that were received from the

19   Canadian boy?

20   A.    Correct.

21   Q.    The 15-year-old, correct?

22   A.    Correct.

23   Q.    And he is the individual who was led to believe that

24   he was communicating with a teenage girl over the Internet?

25   A.    With Ariella Gold.

1   Q.    Okay.  And he was led to believe that Ariella Gold was

2   interested in seeing naked pictures of himself by having

3   naked pictures of a teenage girl sent to him, correct?

4   A.    Correct.

5   Q.    Okay.  And this individual, he's the only person out

6   of all the individuals who were targeted, based upon your

7   knowledge, who actually did go ahead and send an image of

8   himself engaged in sexually explicit conduct, correct?

9   A.    Correct.

10  Q.    Since that time, is he still the only individual that

11  you've been able to determine actually did what was asked of

12  him as far as sending sexually explicit conduct over the

13  Internet?

14  A.    To my knowledge, yes.

15  Q.    Throughout -- based upon all of your review of the

16  materials now in your possession and the investigation in

17  this case to date?

18  A.    Based on what I know.  But again, the forensics are

19  not done.

20  Q.    And so in essence, relating now back to November 12,

21  2012, the subpoena served by ICE on Facebook revealed that

22  someone logged onto an Ariella Gold Facebook page and sent a

23  friend request to the teenaged boy's ten-year-old brother,

24  correct?

25  A.    Correct.

1   Q.   Who also had a Facebook page apparently?

2   A.   Correct.

3   Q.   Okay.  I thought you had to be 13 to have a Facebook

4   page?

5   A.   You do, but that does not stop anyone from creating

6   one.

7   Q.   All right.  And so -- this is just speculation, but

8   it's presumed that the person who knew about the

9   ten-year-old learned about the ten-year-old on the

10  15-year-old's Facebook page, his family contacts, things

11  like that?

12  A.   I'm sorry.  Can you repeat that?

13  Q.   That the person who sent the friend request from

14  Ariella Gold learned about the ten-year-old from the

15  15-year-old's Facebook page?

16  A.   Correct.

17  Q.   Okay.  And there was no message sent with that friend

18  request, correct?

19  A.   Not to my knowledge.

20  Q.   And you know Facebook has -- you have the ability to

21  not only make a friend request, but send a message at the

22  same time?

23  A.   Yes.

24  Q.   So it was just a simple friend request that would have

25  required the ten-year-old either to confirm the friend

1    request, to deny the friend request, or to ignore it,

2    correct?

3    A.    Um-hum, yes.

4    Q.    Okay.  And when you then went to execute the arrest

5    warrant on William Koch on January 11, you determined that

6    there were electronics that were replaced in the home,

7    including Smartphones and a laptop, correct?

8    A.    Correct.

9    Q.    And those items have been seized?

10   A.    Correct.

11   Q.    Okay.  They weren't -- the family wasn't under any

12   order not to get a new computer or get Smartphones or

13   anything like that at the time, correct?

14   A.    No.

15   Q.    You seized the items they had based upon your desire

16   to search those items based upon your investigation up until

17   the time you seized those items, correct?

18   A.    Correct.

19   Q.    And you seized those items so that you could search

20   those items for evidence that would support your

21   investigation or help shed more light on the investigation,

22   maybe help prove which devices were used to send different

23   messages and things like that, correct?

24   A.    Um-hum, yes.

25   Q.    Okay.  Now, have you had the opportunity to examine

1    the items that were seized on January 11?

2    A.    Not yet, no.

3    Q.    Okay.  So you don't know whether or not any of those

4    devices were used to access an Ariella Gold Facebook

5    account?

6    A.    Not yet.

7    Q.    To send a ten-year-old a friend request, correct?

8    A.    Correct.

9    Q.    And quite frankly, you really wouldn't need anything

10   special to do that?  You could go to the public library, go

11   onto an Ariella Gold FaceBook account if you knew the

12   password, and send a friend request to anybody you wanted

13   to; correct?

14   A.    I don't know.

15   Q.    But we don't know if there is evidence yet on the Koch

16   family computers or Internet capable devices that those

17   devices were used to access an Ariella Gold FaceBook account

18   and send friend requests or messages or anything like that?

19   A.    Well, actually Facebook provides an IP address from

20   where you're logged on.  And that IP address came back to

21   26178 Osborne Road.

22   Q.    So the IP address that was used to create the Ariella

23   Gold account?

24   A.    Facebook was issued a subpoena for all account

25   information for Ariella Gold --

1    Q.    Okay.

2    A.    -- from August 1, 2012 to November 9, 2012.  In

3    response they provided the logins, but additionally the IP

4    address for all the logins by Ariella Gold.  That IP address

5    was then identified by RoadRunner as being subscribed to by

6    William Koch, 26178 Osborne Road, Columbia Station, Ohio.

7    Q.    So the Ariella Gold account was created using a device

8    with the IP address that belonged to the Kochs?

9    A.    That's correct.  And the login activity also came from

10   that address.

11   Q.    Now, you've testified concerning William J. Koch's

12   prior criminal conviction, correct?

13   A.    Correct.

14   Q.    You're aware that he has no other criminal

15   convictions, correct?

16   A.    Not to my knowledge.

17   Q.    And as it relates to the offense conduct in that case,

18   the allegations were made by foster children -- you

19   indicated his brother, that it was -- that he was

20   charged -- Mr. Koch was charged, his brother was charged,

21   and his brother's son was charged.  All three were charged

22   with --

23   A.    I don't know if the son was charged.  This is the

24   information I received from Brunswick Hills.  I know that

25   the two adult males were charged.

1    Q.    Okay.  Was the other son investigated?

2    A.    Yes.

3    Q.    Okay.  Now, the offense conduct in that case, if you

4    recall, took place in 2005, correct, or the allegations were

5    that back in 2005 these girls accused their, I guess he is

6    their -- he is not their natural father.  He is their foster

7    father?

8    A.    I am not familiar with the exact relationship between

9    the two.

10   Q.    Okay.  Are you familiar with the ages of the girls who

11   made the allegations?

12   A.    All I know is they were minors at the time.

13   Q.    Do you know that they were 15 and 17 at the time?

14   A.    Minors is what I know.

15   Q.    Okay.  And -- well, you testified that the men were

16   originally charged with rape, correct?

17   A.    Correct.

18   Q.    You know under Ohio law rape carries with it a very

19   severe sentence, correct?

20   A.    Correct.

21   Q.    And that these were allegations made by Mr. Koch's

22   brother-in-law's -- you don't know how they're related to

23   him.  You believe they're his children of some type but you

24   don't know if they're foster children or stepchildren?

25   A.    No.  I testified to the information I received from

1    the officer in Brunswick Hills.

2    Q.    Okay.  And you're aware that then it was like several

3    years later that the charges were brought forward in 2009,

4    the allegations -- the alleged activity took place in 2005

5    and the allegations were made in 2009 when the girls were no

6    longer minors?

7    A.    Yes.

8    Q.    Okay.  And based upon the allegations, charges were

9    brought, investigation was had, and a case was pending

10   against Mr. Koch and his brother-in-law, correct?

11   A.    Correct.

12   Q.    And Mr. Koch eventually entered into a plea agreement

13   to pleading to a GSI count and received a year in jail,

14   correct?

15   A.    Correct.

16   Q.    Do you know that Mr. Koch -- well, you already said

17   you don't know if he has any other record other than that?

18   A.    I do not.

19   Q.    In the pretrial services report there is some

20   reflection.  It said that the investigator believed that Mr.

21   Koch may have been covering for Billy Koch, that they

22   believe that Billy was involved in these sex assaults as

23   well?

24   A.    Actually those were statements made by William T.

25   Koch, that his dad took the rap for him.  He made those

1    statements to several people in his performing arts group,

2    and those statements were then told to us when we conducted

3    interviews with those people.

4    Q.    Okay.  So -- well, but those statements then

5    were -- were those statements conveyed to Brunswick police,

6    or to the police?

7    A.    Brunswick police told me initially that they

8    were -- they had investigated William T. Koch along with the

9    son of Mr. Reichle and that he was originally someone they

10   had looked at for hurting these girls.

11   Q.    Right.  Now, again, you don't know the ages of the

12   girls?  You have no reason to doubt if I tell you at the

13   time of the offense conduct they were 15 and 17 at the time,

14   correct?

15   A.    All I know is they were minors.

16   Q.    But you do know the offense conduct took place in

17   2005, correct?

18   A.    Yes.

19   Q.    And you know that in 2005, Billy Koch would have been

20   15 years old himself, correct?

21   A.    I'll take your word on the math.

22   Q.    Okay.  And you know, and you learned when you first

23   met Billy Koch, that he does have a physical disability?

24   A.    Yes.

25   Q.    And that he suffers from cerebral palsy?

1    A.    Yes.

2    Q.    Meaning his balance is poor and his strength is weak

3    in his extremities?

4    A.    It affects everybody in a different way.

5    Q.    Right.  But he appeared to be affected by cerebral

6    palsy?

7    A.    Yes.

8    Q.    To the extent that if there was kids his same age who

9    were healthy, 15 or 17 years old, the likelihood of him

10   being able to prey upon them or even attempting to prey upon

11   them would be less likely based upon his physical condition?

12   A.    I can't say that at all, no.

13   Q.    Okay.  Ultimately, though, he was never charged in

14   state court for the allegations that his father eventually

15   took a plea bargain to do a year in jail for, correct?

16   A.    No, he was not.

17              MR. BRYAN:  I have nothing further, Your Honor.

18              THE COURT:  Any redirect limited to the scope of

19   cross?

20              MR. SULLIVAN:  Just very brief.

21              REDIRECT EXAMINATION OF KELLY LIBERTI

22   BY MR. SULLIVAN:

23   Q.    Agent, Mr. Bryan asked you a question about the

24   forensic examinations on the computers that were seized by

25   the Lorain County sheriff's office.  And I believe they were

1    seized in December of 2010; is that right?

2    A.    Yes, it is.

3    Q.    And he asked you if there was any evidence in those

4    computers of Mr. Koch hacking into any accounts.  I just

5    want to be clear.  On those computers for the Lorain County,

6    they found some evidence on the Toshiba laptop about the

7    searches for how to hack into accounts; is that right?

8    A.    Yes, they did.

9    Q.    That Ariella Gold, the Facebook activity for that

10   account, when you got the results, when you reviewed the

11   results that came back from Facebook, did it show the

12   activity on the account?

13   A.    Yes, it did.

14   Q.    And could you just generally describe whether it was

15   often or rare?

16   A.    The account showed almost daily logins to Facebook as

17   Ariella Gold from -- the subpoena covered August through

18   November.  And in that time period of the subpoena, pretty

19   much every day, every other day, logins to that account.

20   Q.    And was there a gap, though, in September?

21   A.    Yes.

22   Q.    Right after --

23   A.    There was a -- there was a gap right after we executed

24   the September 24 search warrant to the first week in

25   November.

1    Q.    Okay.  And then just -- I think Mr. Bryan also asked

2    you if at any point that the Kochs were under any type of

3    order not to get anymore computer equipment?  Do you

4    remember that question?

5    A.    Yes, I do.

6    Q.    Let me just ask you this.  In August of 2011 when you

7    went to the home, Mr. Koch and Mrs. Koch were both home,

8    right?

9    A.    Correct.  Mrs. Koch left while we were there.

10   Q.    But they were there -- she was there when you got

11   there?

12   A.    Yes.

13   Q.    So they were aware of the nature of your visit?

14   A.    Yes.

15   Q.    And they were aware of what was -- what William T.

16   Koch was accused of doing?

17   A.    Yes.

18   Q.    And then in September of 2012 when you went back a

19   year later and you actually did a search warrant and took

20   all their digital equipment, was Mrs. Koch home?

21   A.    Yes, she was.

22   Q.    And was she aware of what the allegations were

23   regarding her son?

24   A.    Yes, she was.

25   Q.    Okay.  Thank you.  I have nothing further.

 1          THE COURT:  Ms. Liberti, thank you.  You may step

 2     down.

 3          THE WITNESS:  Thank you.

 4          THE COURT:  Mr. Sullivan, any other witnesses?

 5          MR. SULLIVAN:  Judge, no.  Subject to your

 6     accepting Government's Exhibit 1 that's been marked for

 7     identification as well as considering the affidavit in

 8     support of the criminal complaint as well as the pretrial

 9     services report, the United States would rest.

10          THE COURT:  Any objection to the admission of

11     Government's Exhibit 1?

12          MR. BRYAN:  No, Your Honor.

13          THE COURT:  All right.  Its admitted.

14        Any witnesses or proffers, Mr. Bryan?

15          MR. BRYAN:  Your Honor, I would just proffer on

16     behalf of Mr. Koch, present in court today are his mother

17     and father.  We've heard testimony regarding his father.

18     Ms. Liberti testified concerning what she knew about that

19     case.

20        I would proffer for the record that the complaining

21     witnesses in that case were 15 and 17 at the time of the

22     alleged offense conduct in 2005, that they were the foster

23     children of Mrs. Koch's sister and her brother-in-law, that

24     there were some problems in the family, and that the girls

25     made allegations in 2009 not only against their foster

1    father, then adoptive father -- I believe they were adopted

2    after they were -- while they were foster children they

3    became adopted, but they made allegations against other

4    people, including Mr. Koch.

5         Mr. Koch pled not guilty at his initial proceeding.

6    The case was pending for a period of time.  He was

7    threatened with very serious charges, including rape and

8    sentences that were off the charts.  And with the advice of

9    his attorney, he agreed to enter into a plea agreement where

10   actually the parties recommended the joint sentence -- a

11   joint recommendation of nine months of incarceration.  But

12   the sentencing judge in Medina County didn't listen to the

13   recommendation but went ahead and sentenced Mr. Koch to a

14   period of 12 months of incarceration.

15        We would also proffer for the record that this is his

16   only offense, that he is a retiree, that he worked 32 years

17   at Lubrizol out in Avon, that he was a valued employee, that

18   Mr. Koch's mother works at a school cafeteria.  They do have

19   another child in the home, Mr. Koch's younger brother, who

20   lives in the home.

21        Some of the devices that were -- that they saw when

22   Mr. Koch was arrested on January 11 were devices that were

23   purchased as Christmas presents, including the iPhone that

24   was a gift to Mr. Koch's younger brother, who is now 14, I

25   believe.

1       Mr. Koch was not given an iPhone.  The devices were

2   used by the family during that period of time.

3       So we would proffer that for the record.

4       The Kochs are here on behalf of their son.  They will

5   accept -- I don't want to say they accept custody, but they

6   will permit their son to remain to live with them in their

7   home under whatever conditions the Court deems appropriate,

8   including electronic monitoring and whatever supervision and

9   counseling and the like that this Court could impose.

10      So that's my proffer, and I'll reserve my further

11  comments.

12          THE COURT:  Let's, first of all, take up probable

13  cause.  Argument on probable cause, Mr. Sullivan?

14          MR. SULLIVAN:  Judge, I think as is detailed in

15  the criminal complaint and the affidavit in support of the

16  criminal complaint as well as the testimony of Agent

17  Liberti, the evidence has established here today that on

18  September 9, 2012, the defendant did, from his home in the

19  Northern District of Ohio, communicate with a 15-year-old

20  boy in Canada.  The IP addresses all come back to the home

21  where it occurred.  And we know that -- actually, I think at

22  that time Mr. Koch's father was still incarcerated.

23      But he communicated with this 15-year-old boy in

24  Canada, pretending to be a 15-year-old girl, sent nude

25  images of a minor female to this Canadian boy, and in

1    exchange asked the boy to masturbate on the webcam.  So it

2    charges him with using, persuading, inducing, enticing a

3    minor to engage in sexually explicit conduct for the purpose

4    of transmitting a live visual depiction of such conduct,

5    knowing that it would be transmitted using any means or

6    facility of interstate or foreign commerce.

7         So here it's pretty clear that he communicated with a

8    boy in Canada from his home in Ohio and enticed this boy to

9    masturbate on the webcam for the purpose of creating this

10   live visual depiction, which the boy did.

11        So it would be the government's position that probable

12   cause has been established in this case.

13        Do you want me to go on to detention?

14             THE COURT:  No.  Let's hear Mr. Bryan on probable

15   cause.

16             MR. BRYAN:  Your Honor, I'll just be brief

17   regarding probable cause because the threshold is so low.

18        But the evidence presented today indicates that there

19   was a contact made with the 15-year-old in Canada from the

20   Facebook account attributable to a user named Ariella Gold.

21   Investigation has since revealed that that account is

22   affiliated with an IP address at the Koch residence in

23   Colombia Station, Ohio.

24        Mr. Koch did not make any admissions regarding the

25   activity, the inducing or the enticing that is alleged in

1    the complaint.

2          The evidence related to that, I would say, is in

3    equipoise in light of the fact that any number of people

4    could have access to a device that has an IP address at the

5    Columbia Station home.

6          I think all the other information has been presented

7    in an effort to demonstrate sort of a propensity that

8    similar things were being done using text messaging devices

9    or sending text messages to the various Billy Elliot actors

10   asking them to do similar things that ultimately this

11   individual in Canada was asked to do and then in fact did

12   do, apparently, under the mistaken impression that he was

13   sending images to a teenaged girl who had just sent him

14   images of herself in an undressed state.

15         So I would say at most the evidence is in equipoise.

16   I don't think the similarity between the two would take it

17   out of equipoise.

18         Obviously all of the information that has been

19   presented in the affidavits and in the agent's testimony

20   does raise concern.  However, that concern and -- that

21   concern itself I don't think is evidence of probable cause.

22         So I would -- again, I'm not going to belabor this

23   point because I think the greater issue is the issue of bond

24   in this case.  But I think there is at least an argument

25   that the evidence is sort of 50 percent.

1          THE COURT:  All right.  I'm going to find that

2     there is probable cause and then bind this case over to the

3     grand jury and they'll reexamine probable cause in that

4     forum.

5          Let's go on to detention.

6          MR. SULLIVAN:  Thank you, Judge.

7          Judge, as you know, the U.S. code has a presumption

8     for detention in this matter because of the nature of the

9     charge.  So there is a statutory presumption for detention.

10    And it would be the government's position that nothing that

11    has transpired today has rebutted that presumption, but in

12    fact it's been solidified and strengthened.

13         The evidence has shown that over the past two years,

14    two-and-a-half years, or a little bit over two years, Mr.

15    Koch has tormented at least six children.

16         And, you know, while I understand Mr. Bryan said that

17    did any of these kids comply with it and Agent Liberti said

18    no, other than the Canadian boy, the fact is these are

19    five -- other than the Canadian boy, we're talking about

20    five kids who are just actors in a Broadway play and they

21    have to live in the fear that someone is stalking them

22    because someone is sending them these text messages and

23    trying to coerce them into sending nude photographs and

24    making threats to them if they don't.

25         So he has engaged in this pattern where he has

1    tormented six children over the past two years.  And that

2    would be bad enough.  And this is -- you know, this takes

3    the expression, you know, fool me once shame on you, to a

4    different degree because he was talked to in August of 2011.

5    He was told "Stop doing this."  He did it.  And he kept

6    doing it.

7          And as you can see from the detail in the affidavit in

8    support of the search warrant, the activity got

9    progressively more aggressive and more threatening to these

10   kids.

11         So after he was visited by the FBI, instead of ceasing

12   and desisting, he ratcheted up his activity.  He got more

13   threatening, more aggressive with these kids, including this

14   activity with the boy in Canada where he tried to extort

15   that boy in Canada to have sex with his ten-year-old brother

16   or else he was going to send nude pictures to all his

17   Facebook friends.  I mean, to a 15-year-old child that's a

18   pretty heavy threat.  And thankfully the young boy in Canada

19   didn't comply.  But it's egregious conduct.  And it's

20   egregious conduct that came after he was spoken to by the

21   FBI.

22         And then they go in September and take all his

23   computers.  And within a short amount of time they have

24   computers again, and now he is actually trying to friend the

25   ten-year-old brother of the boy in Canada.

1        So, I mean, it's clear that he is a danger.  He is a

2   danger to the community, and I understand certainly he has a

3   physical condition and I'm not -- I'm certainly cognizant of

4   that.  But the fact is it has not prevented him from

5   graduating high school.  It has not prevented him from

6   getting A's and B's in college.  It does not prevent him

7   from traveling to New York and Chicago by himself to see

8   Broadway plays by himself unbeknownst to his parents.

9   Doesn't stop him from racking up $70,000 worth of bills on

10  his father's account because he's using his father's credit

11  card to buy things and to travel and to buy equipment.

12       So while I'm certainly cognizant of the physical

13  condition, it has certainly not prevented him from carrying

14  on.  And we know it has not prevented him from tormenting

15  six children across the country; internationally with

16  Canada.

17       So I certainly am expecting that Mr. Bryan will talk

18  at length about Mr. Koch's physical condition, and again,

19  not that we're unsympathetic toward it, but he is a danger.

20  He has exhibited that.  He has been warned not once but

21  twice.  And if you include the search warrant on behalf of

22  the Lorain County Sheriff's Department, I mean, you know,

23  they're visited by law enforcement three separate times, and

24  he's still engaging in the conduct.

25       So he is a danger to the community.  And frankly,

1    Judge, the only place that he would have to go home would be

2    at his parents' house where he would be -- you know, his

3    mother was there for the first visit in August.  She was

4    there for the search warrant in September.  And yet she

5    sticks right in the kitchen a laptop with no protection on

6    it that he can use unsupervised whenever he wants.

7         So there is no supervision.  There is no effort to

8    prevent him from engaging in this conduct.  And his father

9    is a convicted -- a registered sex offender and a convicted

10   sex offender.

11        So I don't know that we can -- it's certainly

12   inappropriate to send someone charged with a sex offense

13   home to live with a registered sex offender, who, by the

14   way, he was a suspect with.  But for him being a juvenile

15   and probably because of his physical condition, he may have

16   ended up being -- well, we don't know what would have

17   happened.  But we know he was originally investigated as one

18   of the perpetrators of the crime for which his father did a

19   year in prison.

20        So, you know, Judge, there really is -- that's

21   certainly an inappropriate placement.

22        But beyond that, there is a presumption for detention,

23   and that presumption has not been rebutted.  You know, there

24   is nothing that has rebutted that presumption here, and we

25   feel that the defendant should be detained.

1          THE COURT:  Mr. Bryan.

2          MR. BRYAN:  Your Honor, this is a very

3    complicated case.  And there is a lot to be done between now

4    and when this case is finally resolved.  This is the very

5    beginning stages of the case.  Mr. Koch was just arrested

6    last Friday pursuant to the arrest warrant for him.

7          The investigation of this case has been taking place

8    over an extended period of time.  The FBI has known about

9    Mr. Koch for an extended period of time.  The FBI met with

10   Mr. Koch back in August of 2000 -- and the dates are all

11   over the place in my own mind, but they're clearly set forth

12   in the affidavit which has been made an exhibit to Your

13   Honor to be able to see the chronology of events here.

14         As much as I would like to be able to stand up and

15   defend against the charges today and try to make a defense

16   against the facts, we're not in a position to do that at

17   this stage.

18         We're rarely in a position to do that in any case.

19   Some cases the facts are a little easier than others to

20   consume and to digest and to figure out what's going on, but

21   in this case it's going to take a heck of a lot of pretrial

22   preparation.

23         The employment of our own computer forensic experts or

24   forensic computer experts, the review of the evidence that's

25   been seized here, and what I think the testimony of the

63

1   agent does reveal is that there is a lot to be done, not

2   only by the government yet because there are holes as it

3   relates to being able to establish specifically that Mr.

4   Koch is the person who even conducted all the activity

5   that's alleged to have been conducted.

6           This is cyberspace.  Cyberspace is accessible not only

7   to Mr. Koch but accessible by anybody who has access to the

8   Internet.

9           Internet service providers and IP addresses are beyond

10  my understanding at this stage, but it's not beyond

11  my -- not beyond my belief that the ability of somebody to

12  mask themselves as someone else over the Internet exists.

13  It happens all the time.  We hear about Anonymous in the

14  news, where they're going into other people's accounts.  And

15  the FBI has been going after groups like Anonymous for years

16  and they can't nail them down and they can't find them

17  because they're using other people's servers.  Quite

18  frankly, they use other people's IP addresses to do the work

19  that they're doing.  So the ability exists out there.

20          What I'm suggesting to Your Honor is that this is not

21  an indefensible case.  The allegations in the complaint are

22  very serious, and we're not trying to minimize that.  They

23  are extremely serious.  But that's not the determination at

24  this stage.  I'm not asking you to find Mr. Koch not guilty

25  of the allegations against him.  I don't think Mr.

1    Sullivan's asking you to find he's guilty.

2        I think there is sort of a certain tone in Mr.

3    Sullivan's voice that it just seems like it can't be anybody

4    else except for Mr. Koch.  There is no way that he has a

5    defense to these charges.

6        Admittedly, weight of the evidence is one of the

7    determinations under 3142 to determine whether or not there

8    are any conditions or combinations of conditions sufficient

9    to warrant an individual's release pending trial in the

10   matter.

11       And I think that's the relevant determination here.  I

12   think the presumption in favor of detention has been

13   rebutted by a number of factors, and not the least of which

14   is Mr. Koch's physical condition.

15       Quite frankly, because of computers, people who are

16   disabled have the ability to appear and do things that they

17   wouldn't be able to do without the assistance of computers.

18   Perhaps the world's most intelligent person, at least as it

19   relates to cosmology and astrophysics, is a person who can't

20   move a muscle of his body other than to twitch and use his

21   computer to communicate by using, you know, twitching and

22   changing his body in certain ways to talk through his

23   computer.

24       Literally, Stephen Hawking has the ability to commit

25   the same offense that's alleged that Mr. Koch has committed

1    in this case.  But I don't think that anybody would suggest

2    that Stephen Hawking in his physical condition is a physical

3    threat to others, is a threat to others in any way.

4         Now, we don't want children to be harmed emotionally

5    by receiving text messages or things like that from

6    someone -- and I'm not suggesting Stephen Hawking would ever

7    do anything like this, but someone in his similar condition,

8    we can limit his access to these devices.  We can order that

9    he not have access to the devices.  And at the first hint

10   that the person has access to the devices, then you can

11   revoke their bond and take their bond away and order them to

12   remain detained while their case is pending.

13        But it is a relevant consideration.  And I think it is

14   a consideration that rebuts the presumption in favor of

15   detention, that Mr. Koch does suffer from cerebral palsy.

16   Now, people suffer from it in varying degrees.  He appears

17   okay as he's sitting there.  He walks with his feet

18   pronated.  He can't run.  His balance is very poor.  His

19   ability to physically assault anybody is severely limited.

20        And the belief that under these circumstances where he

21   could be placed on pretrial supervision on electronic

22   monitoring, ordered to counseling and ordered not to have

23   any contact whatsoever to Internet access devices, that he

24   somehow is a threat to the community is one that I don't

25   think the evidence would support.

1          Just to be honest, I think the FBI's own actions in

2     this case reflect their lack of concern about Mr. Koch as a

3     threat, a physical threat to others.

4          Admittedly, their patience was tried based upon the

5     Internet activity that they saw that seemed to be continuing

6     over and over again.  But even when they executed the search

7     warrant on September 24, 2012 where they had all the

8     information that was in the search warrant, including all

9     the information about the Billy Elliot actors, all the

10    requests that were made of the Billy Elliot actors, there

11    was no attempt to place Mr. Koch under arrest at that

12    juncture.

13         It was only after they learned through the Canadian

14    authorities that there had been earlier contacts with a

15    Canadian teenager who actually did fall for the ruse and did

16    in fact send images of himself engaged in sexually explicit

17    activity that the whole tenor of the government's approach

18    to Mr. Koch changed.

19         Now, what's important to note is all of that activity,

20    except for the Ariella Gold Facebook friend request in

21    November of 2011, the activity concerning the 15-year-old,

22    occurred before the execution of that search warrant.

23         I know it may be difficult following along with the

24    dates as they're being conveyed by the agent from the stand,

25    but the affidavit makes it clear, when you look at the

1    affidavit, which is an exhibit in this case, that that

2    activity took place before the execution of the search

3    warrant.

4         The offense conduct that's alleged in the complaint

5    itself took place before the FBI executed the search warrant

6    on September 12 -- or September 24 of 2012.  And they only

7    learned about that activity from the Canadian authorities at

8    the end of December, on December 26, and then again on

9    January 4 when an ICE agent communicated with someone from

10   Canada who was investigating these activities that actually

11   took place before the execution of the search warrant.

12        Now, I would agree that it is very disturbing that

13   apparently someone using the Ariella Gold Facebook account

14   sent the ten-year-old a friend request after the execution

15   of the search warrant.  I don't think the evidence is clear

16   who did that at this juncture.  Anybody who could have

17   accessed the Ariella Gold Facebook account could have sent

18   that friend request.

19        But be that as it may, that's not the determination.

20   Whether that behavior shows poor judgment, whether it shows

21   a criminal mind, that's not the issue here.  The issue here

22   is at this stage, at the detention determination stage, is

23   whether or not a 23-year-old young man with cerebral palsy

24   is a danger to the community or a flight risk.

25        Now, he has shown the ability to travel on his own.

1       We admit that.  He has traveled to watch shows in different

2       cities and things of that nature.

3           But again, his passport has already been turned over

4       to pretrial services.  He would be under electronic

5       monitoring.  There are conditions that can be placed upon

6       him, obviously an order not to travel at all and only to be

7       able to be released from electronic monitoring or from his

8       home for doctor visits and the like, those types of orders

9       mitigate in favor of granting a bond in this case.

10          This is the very beginning stages, I think, of what's

11      going to be a very long and complicated matter.  And I think

12      the conditions, now that the charges are pending against Mr.

13      Koch and obviously he has been made aware and apprised of

14      the potential penalties that he faces, which the government

15      may assert makes him more likely to be a flight risk, I

16      would just submit makes him more likely to follow the

17      conditions of bond, especially considering the circumstances

18      of his life are such that granting him a bond at this stage

19      would not be a threat to society in any way or would be a

20      threat to justice with Mr. Koch fleeing the Court's

21      jurisdiction.

22          Admittedly, I wish there was a situation where I could

23      say that his parents, that there aren't any issues there,

24      but I would submit to Your Honor that there are a lot of

25      people in circumstances like Mr. Koch's father who, whether

1    or not they engaged in the activity, had made mistakes in an

2    otherwise exemplary life.  He worked 32 years at the same

3    company.  He is retired from that company.  He has provided

4    a stable life for himself and his wife and children

5    throughout his entire life.

6        If Your Honor feels that placement at his parents'

7    home would be inappropriate because of his father's

8    conviction in state court for a matter that was -- the

9    offense conduct occurred back in 2005, I was advised that

10   the grandparents' home is also available and would ask that

11   at least pretrial services be ordered to at least

12   investigate the grandparents' home as a possible placement

13   as well, if being placed with his mother and father -- or

14   not being placed with them, but being permitted to reside

15   with his mother and father under conditions Your Honor can

16   impose is not appropriate in light of his father's history,

17   his grandparents' home, I've been told, is appropriate and a

18   place where they would consent to their grandson being able

19   to reside with them during the pendency of this case.

20       All I would say, Your Honor, is every criminal

21   defendant is presumed innocent.  The true determination,

22   notwithstanding the seriousness of the charges, is whether

23   or not an individual -- when it comes to the issue of

24   bond -- is whether or not an individual criminal defendant

25   is truly a threat to society or a flight risk.

1         Based upon the conditions Your Honor has the authority

2    and the ability to impose and based upon the professionalism

3    of our pretrial services department, I believe that there

4    are conditions that are sufficient to warrant Mr. Koch's

5    release on bond at this time.

6         Thank you.

7              THE COURT:  Thank you, Mr. Bryan.

8         Any rebuttal, Mr. Sullivan?

9              MR. SULLIVAN:  Judge, just very briefly.

10        He made that comment about anybody could have sent the

11   message being Ariella Gold in November of 2012, but I think

12   Agent Liberti testified that Ariella Gold was logged on that

13   day, and that the IP address came back to the same IP

14   address which came back to the Koch residence.  So not just

15   anybody.  It has to be somebody from that house that logged

16   in and sent that message.

17        And just to clarify for the record, we have the

18   indictment for Mr. Bryan, the indictment that Mr. Koch pled

19   guilty to.  Just to be clear, two of the counts happened in

20   2005, but Count 3, also which he pled guilty to, happened in

21   September 2008.  So his sexual activity with his nieces

22   occurred over a three-year period.  It was not just 2005.  I

23   want to make that clear.

24             THE COURT:  Thank you, Mr. Sullivan.

25        The motion is taken under advisement.

1        Mr. Koch, I'm remanding you back to the United States

2   marshal for custody pending my decision on the motion.

3        Anything further from the United States?

4            MR. SULLIVAN:  No.  Thank you, Judge.

5            THE COURT:  Mr. Bryan, anything further for Mr.

6   Koch?

7            MR. BRYAN:  No.  Thank you, Judge.  Thank you for

8   your patience.

9            THE COURT:  Being no further business before the

10  Court in this case, we are in recess.

11           THE DEPUTY CLERK:  All rise.

12       (Proceedings concluded at 3:15 p.m.)

13

14              C E R T I F I C A T E

15

16        I certify that the forgoing is a correct

17  transcript from the record of proceedings in the

18  above-entitled matter.

19

20          S/Caroline Mahnke                3/6/13

21          Caroline Mahnke, RMR, CRR        Date

22

23

24

25